# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
## Judge John R. Tunheim

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AARON JASON COPE,<br><br>Defendant. | Criminal No. 11-cr-00106-JRT<br><br><br>**FINDINGS OF FACT,<br>CONCLUSIONS OF LAW,<br>AND ORDER** |

Joseph Mackey and Mark S. Pestal, Assistant United States Attorneys, **OFFICE OF THE UNITED STATES ATTORNEY**, 1225 Seventeenth Street, Suite 700, Denver, CO 80202, for plaintiff.

Timothy Vitow Anderson, **ANDERSON & ASSOCIATES, P.C. - VIRGINIA BEACH**, 2492 North Landing Road, Suite 104, Virginia Beach, VA 23456, for defendant.

Defendant Aaron Jason Cope is charged with a single count of operating a common air carrier while under the influence of alcohol in violation of 18 U.S.C. § 342. A bench trial[1] was conducted on June 6 and 7, 2011, in Denver, Colorado. Based upon the presentations of counsel, the testimony of the witnesses, and the exhibits received into evidence, the Court hereby makes the following:

## FINDINGS OF FACT

1. All of the Findings of Fact set forth herein are undisputed or have been proven beyond a reasonable doubt through evidence presented during the trial.

2. To the extent that the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

---

[1] Cope waived his right to be tried by a jury, the United States consented to holding a bench trial, and the Court approved under Federal Rule of Criminal Procedure 23(a).

3.  Cope was the co-pilot and first officer on United Express Flight 7687, a commercial flight operated by Shuttle America, Inc., from Austin, Texas, to Denver, Colorado, on December 8, 2009.

4.  The aircraft used for Flight 7687, an Embraer 170, requires two pilots to operate – a "Pilot Flying" and a "Pilot Monitoring." The Pilot Flying is the sole manipulator of the aircraft's controls, while the Pilot Monitoring monitors the controls, conducts a safety review, operates the landing gear and flap handle, maintains radio contact, performs certain checklist "call-outs," and provides back-up for the Pilot Flying, among other duties. In the course of any given flight, the Pilot Monitoring may be given temporary responsibility for manipulating the controls. The two pilots operate as a team. (Transcript ("Tr.") at 19-21, 26, 37, 39-40.)

5.  Being a first officer and Pilot Monitoring on a commercial air flight is a "safety sensitive" position. Individuals in safety sensitive positions are required to comply with certain regulations issued by the Federal Aviation Administration ("FAA") and the Department of Transportation ("DOT"). (Tr. at 186.)

6.  Robert Obodzinski was the captain and Pilot Flying of Flight 7687, while Cope was the first officer and Pilot Monitoring. (Tr. at 17-18, 56-57; Plaintiff's Exhibit ("Px.") 7.)

7.  Prior to December 7, 2009, Obodzinski had flown with Cope as co-pilot only once, approximately a year previously. They had no personal friendship. (Tr. at 43, 75-76; Defendant's Exhibit ("Dx.") 1.)

8. On December 7, 2009, Obodzinski and Cope flew from Denver to Austin without incident. When the crew – Obodzinski, Cope, and two flight attendants – arrived in Austin, they went to a local hotel. The next "leg" of their shift was Flight 7687, scheduled to depart from Austin at 8:00 a.m. the next day. (Tr. at 44; Px. 7.)

9. At the hotel, Obodzinski invited the other crew members to dinner. The flight attendants accepted, but Cope declined, stating he did not feel well. (Tr. at 45.)

10. The next time Obodzinski saw Cope was in the hotel lobby the morning of December 8, 2009. At that time, Obodzinski observed that "nothing really seemed unusual [about Cope]. I think he had a little bit of a puffy face, and his eyes were a little red, and I assumed that since he said the night before he wasn't feeling well, that he was probably coming down with a cold." (Tr. at 46.)

11. Obodzinski and Cope sat next to each other in close proximity in the cockpit on Flight 7687 from Austin to Denver. Obodzinski testified that during the flight, Cope "appeared to be sitting straight, thinking clearly, speaking clearly." Every few minutes during the flight, however, Obodzinski detected an unusual odor, which he eventually concluded was the smell of an alcoholic beverage. (Tr. at 58-59; Px. 4, 10.)

12. Upon arriving at the gate in Denver International Airport, Obodzinski leaned over Cope and "took a big whiff." Obodzinski concluded that the smell of an alcoholic beverage was emanating from Cope. (Tr. at 59-60; Px. 10; Dx. 1.)

13. Cope went outside to conduct a post-flight inspection. (Tr. at 60.)

14. The crew was scheduled to depart from the gate for another flight after a turnaround time of approximately thirty to forty-five minutes. Concerned about boarding

the flight while questioning Cope's sobriety, Obodzinski contacted dispatch to delay the departing flight until the issue was resolved. Obodzinski spoke by telephone with Ken Barthel, the acting chief pilot, as well as his union representative, and Tracy Kinkade, a Human Resource Manager for Republic Airways, the parent company of Shuttle America. (Tr. at 61-66, 184-85.)

15. Obodzinski testified that between his conversations with Shuttle America staff, he said to Cope, "if you have any problem taking a breathalyzer, call off sick and get out of here[,]" to which Cope replied, "well, I guess I better call off sick then." Cope was then out of Obodzinski's sight for approximately five to fifteen minutes. (Tr. at 65-67.)

16. Cope was scheduled to serve as Pilot Flying on the outgoing flight, the next leg of his and Obodzinski's December 8. 2009 shift. (Tr. at 73.)

17. From his conversations with Barthel and Kinkade, Obodzinski came to understand that he was to escort Cope to an alcohol testing facility in the main terminal and ensure that he did not eat or drink on the way over. (Tr. at 66.)

18. Obodzinski testified that when he came into contact with Cope again, Cope admitted he had consumed "a couple of beers" the previous night. Further, Obodzinski testified that later, at the testing facility, Cope stated he had gone to a bar with a friend and also purchased beers from a gas station near the hotel. Obodzinski also testified that on their way to the testing facility, Cope quickly used a drinking fountain, consuming a few gulps of water. (Tr. at 67-69, 71, 100.)

19. In a written statement shortly after the incident, however, Obodzinski did not reference Cope's alleged admissions of alcohol use or his use of the water fountain. He did state that "[w]hile escorting [Cope to the testing facility], I noticed a few additional signs that he may have been avoiding close proximity with anyone in the airport, including going out of his way to board a mostly empty train car instead of one that pulled up about half full when we were traveling from the B concourse [where the flight landed] to the main [t]erminal." (Px. 10; Dx. 1; Tr. at 69.)

20. Richard Jones, then employed by the City and County of Denver as a senior clinical care associate and breath alcohol technician, performed an evidential breath test on Cope at the testing facility using a Drager Breathalyzer 7410. (Tr. at 114, 124; Px. 15, 16.)

21. Cope's expert Dr. Patricia Beth Rosen, an emergency room physician primarily self-employed as a consultant with Austin Toxicology, offered expert testimony regarding medical toxicology, retrograde extrapolation, effects of alcohol on humans, and various testing methods available for alcohol testing. (Tr. at 374-75, 379.)

22. Retrograde extrapolation, or retrograde analysis, is a method of employing an average hourly elimination rate to predict what an individual's blood alcohol content ("BAC") was prior to an administered test. (Tr. at 221-22.)

23. Rosen testified that, in her view, the alcohol breath test is "not a very good test" and that it was not possible to obtain an accurate BAC reading from a breath test. Specifically, Rosen testified that variables such as the depth of the individual's breath as the test is administered, humidity, and temperature may affect the test's accuracy.

Additionally, the individual on whom the test was conducted would have to be cooperative. (Tr. at 390, 394-95.)

**24.** Jones testified that prior to conducting the test, he smelled a "hint" of an alcoholic beverage emanating from Cope. (Tr. at 127.)

**25.** Jones performed the breath test appropriately, including his conducting an "air blank" test just prior to the administration of the test to detect abnormalities in the ambient air. According to Jones, Cope was cooperative during the test, and he blew properly and for the appropriate amount of time. The test, administered at 10:33 a.m., reflected a BAC of .094 percent in Cope. Jones performed a second, "confirmation" breath test on Cope at 10:54 a.m., which reflected a BAC of .084 percent. The second breath test was likewise properly administered; Cope was cooperative and blew properly and for the appropriate amount of time. (Px. 16; Tr. at 128-29, 132-34, 136-38.)

**26.** Jones then immediately conducted a calibration test on the device to ensure its accuracy. The calibration test confirmed that the device was properly calibrated, its value adjusted by Jones for Denver's altitude. (Tr. at 139; Px. 18, 23.)

**27.** Moreover, two prior tests – a monthly calibration test performed five days earlier, as well as an annual wet bath test performed a few months earlier by the manufacturer – provide additional evidence that the device was functioning properly when Jones administered the breath test to Cope. (Px. 21, 22.)

**28.** Nonetheless, Rosen testified that the rate of consumption reflected in the BAC change between the two tests was "pretty incredible" and reflects an inaccurate

result. According to Rosen, an alcohol test based on a blood sample is much more reliable than a breath test. (Tr. at 392-93, 404-05.)

**29.** Republic Airways' "zero tolerance" policy regarding alcohol consumption in safety sensitive positions considers a BAC of .02 percent grounds for termination. (Tr. at 199; Px. 12.)

**30.** The FAA prohibits an individual from acting as a crewmember of a civil aircraft with a BAC of .04 percent or within eight hours after the consumption of any alcoholic beverage. *See* 14 C.F.R. § 91.17(a)(1), (4).

**31.** Cynthia Silva Burbach, the state toxicologist at the Colorado Department of Health and Environment in the forensic toxicology unit of the laboratory services division for twenty-seven years, offered expert testimony regarding forensic toxicology, the effects of alcohol on a human being, and retrograde extrapolation. (Tr. at 210, 237.)

**32.** Burbach testified that while alcohol consumption often results in physical manifestations such as watery eyes, flushed face, and slurred speech, the absence of visible signs of alcohol consumption does not necessarily mean that an individual is unimpaired. According to Burbach, while an experienced drinker might develop a high tolerance to the visible effects of alcohol consumption, humans cannot develop a tolerance to the cognitive effects. Burbach testified that alcohol consumption diminishes cognitive functioning, including but not limited to the ability to process information, operate a motor vehicle, judge, reason, and multi-task. In addition, Burbach testified that alcohol consumption impairs vision, including peripheral vision. (Tr. at 240-43.)

**33.** Burbach opined that Cope was an experienced drinker, based in part on his comparatively fast "elimination rate" of alcohol as reflected by the drop from .094 percent BAC during his first breathalyzer test at 10:33 a.m., to .084 percent BAC during the second test approximately twenty minutes later. (Tr. at 247-48.)

**34.** According to Burbach, any deviation from 0 percent BAC impairs cognitive function to some degree. (Tr. at 243.)

**35.** Burbach testified that to achieve a .094 BAC, an experienced drinker needs to consume a minimum of four drinks. (Tr. at 249.)

**36.** Using retrograde extrapolation, Burbach estimated that Cope's BAC as Flight 7687 took off was .143, and that he would have consumed at least six to eight drinks to achieve that level. (*Id.*)

**37.** Citing numerous published articles on the topic, Burbach testified that retrograde extrapolation is commonly used in the scientific community, although it is subject to analytic variability. In particular, Burbach testified that breath testing – whether or not it serves as the basis for retrograde extrapolation – is subject to a variance within .02 percent. (Tr. at 236-37, 271-72.)

**38.** According to Rosen, however, retrograde extrapolation cannot offer an accurate estimate of an individual's BAC because of the variability inherent in factors such as an individual's body composition, whether and how much he has eaten, his hydration level, and the proof (alcohol content) of the alcohol he consumed. (Tr. at 407-09.)

39. In applying retrograde extrapolation to determine Cope's BAC at the time of take-off in Austin, several hours before the breath test conducted at Denver International Airport, Burbach used what she deemed the average hourly elimination rate for a male of .015. (Tr. at 223.)

40. When an individual consumes alcohol, his BAC rises in the blood as the alcohol is absorbed during the "absorption phase." After a peak of the individual's maximum alcohol concentration is reached, the individual's BAC decreases during the "elimination phase" until it reaches zero. (Tr. at 275.)

41. In conducting her retrograde extrapolation analysis, Burbach concluded that when the breath test was administered, Cope was in the "elimination phase" of his alcohol consumption. Burbach's conclusion that Cope was in the elimination phase was based on the downward trajectory of his BAC between the two breath tests administered twenty minutes apart, and on her assumption that Cope consumed no alcohol after entering the cockpit of Flight 7687. Had Cope consumed alcohol after landing in Denver, shortly before the first breath test, his BAC would have risen between the first and second tests. (Tr. at 272-73, 314-16, 344-46.)

42. Burbach testified that, in the scientific community, a BAC of .143 percent is considered substantially impaired and substantially under the influence of alcohol. Given the tasks assigned to Cope as first officer, however, Burbach further testified that she would have concerns about Cope's diminished cognitive function and ability to perform such tasks even with a BAC of .02 percent. (Tr. at 244-46.)

43.     In particular, according to Burbach, judgment is "the first thing that goes" as a result of alcohol consumption, and that impaired judgment could lead a pilot to take unnecessary and unsafe risks. (Tr. at 246.)

## CONCLUSIONS OF LAW

The statute Cope is accused of violating, 18 U.S.C. § 342, prohibits an individual from "operat[ing] or direct[ing] the operation of a common carrier while under the influence of alcohol . . . ." While the statute does not define "under the influence of alcohol[,]" 18 U.S.C. § 343 establishes a "mandatory presumption" that an individual with a BAC of .10 percent or greater is under the influence of alcohol. *United States v. Prouse*, 945 F.2d 1017, 1026 (8th Cir. 1991); 18 U.S.C. § 343. The Court concludes that the government has proven beyond a reasonable doubt that Cope is guilty of the charge stated in the indictment.

The most compelling – though certainly not the only – evidence against Cope is the series of two breath tests, reflecting a BAC of .094 and .084 percent, administered approximately four hours after Cope entered the cockpit of a commercial aircraft. Through Rosen's testimony and several articles on which she relies, Cope challenges the general reliability of alcohol breath tests. Yet courts across the country, including the Tenth Circuit, consistently find alcohol breath tests admissible, reliable, and well accepted within the scientific community. *See, e.g., United States v. Smith*, 776 F.2d 892, 898 (10th Cir. 1985) ("The technique of testing breath samples for blood alcohol content has general acceptance in the scientific community . . . ."); *see also United States v. Jackson*, 273 Fed. Appx. 372, 374 (5th Cir. 2008) (per curiam) (unpublished) (breath test

results were obtained pursuant to "accepted scientific methods and equipment of proven accuracy and reliability") (internal quotation omitted); *United States v. Brannon*, 146 F.3d 1194, 1196 (9th Cir. 1998) (finding that the methodology of breathalyzer testing "is well-known and unchallenged" and that deficient, incomplete sample from breathalyzer test was nonetheless admissible); *United States v. Reid*, 929 F.2d 990, 994 (4th Cir. 1991) ("The best means of obtaining evidence of the breath alcohol content, and the least intrusive way of testing, is the breathalyzer test.").

Moreover, the particular device used here, the Drager Breathalyzer 7410, has been specifically approved by the United States Department of Transportation's National Highway Traffic Safety Administration as an evidential breath measurement device. (*See* Tr. at 121-24; Px. 24.) Jones, a veteran breath alcohol technician, testified that he administered both tests properly, and that he conducted an air blank test prior to the administration of the first test and an accuracy test following the administration of the second test. According to Jones, Cope was cooperative throughout both tests and blew appropriately, addressing at least some of the reliability concerns raised by Rosen. While there was a significant drop in the BAC result between the two tests approximately twenty minutes apart, it is reconciled by Cope's apparent experience drinking alcohol, as well as the .02 percent variability inherent in the results. The machine was properly calibrated and functioning. The Court concludes that the breath test results are valid and reliable within the confines of the analytic variability expected of such a device.

Cope also argues that it is impossible to know his BAC when the plane departed, and that retrograde extrapolation is a particularly inaccurate and unreliable method by

which to ascertain that figure. The Court agrees that, due to Cope's individual physical characteristics as well as numerous other unknown variables (including how much he drank, when he stopped drinking, and whether and how much he ate), his precise BAC at the time the plane departed is unknowable. In particular, the change in BAC between the two tests suggests that Cope has a metabolic rate **faster** than the .015 average employed by Burbach; if so, her retrograde extrapolation analysis may have **understated** Cope's BAC at the time of departure.

However, the Court need not and does not rely upon Burbach's specific .143 percent BAC calculation to reach the conclusion that Cope was under the influence of alcohol when the flight departed. It is clear that Cope was in the elimination phase of his alcohol consumption, meaning that his BAC was well above .094 percent during the flight.[2] Throughout trial, Cope suggested he may not have been in the elimination phase when the tests were conducted because he may have consumed alcohol after the flight landed. *See Wallis v. Carco Carriage Corp., Inc.*, Nos. 95-7176, 96-7002, 1997 WL 580498, at *8 (10th Cir. 1997) (unpublished table opinion) (recognizing that "there may be inherent difficulties in making a retrograde extrapolation calculation when there is an intervening consumption of alcohol"). Cope's unsupported contention is devoid of

---

[2] The cases cited by Cope to raise questions regarding the reliability of retrograde extrapolation are inapposite. *See Mata v. State*, 46 S.W.3d 902, 916 (Tx. Crim. App. 2001) (reversing trial court's admission of expert testimony regarding retrograde extrapolation, highlighting numerous concerns about the expert's analysis including mathematical errors and inconsistent statements, but noting that "the science of retrograde extrapolation can be reliable in a given case"); *Smith v. City of Tuscaloosa*, 601 So. 2d 1136, 1140 (Ala. Crim. App. 1992) (citing sources critical of retrograde extrapolation, but concluding that "the issue of whether any expert should be allowed to testify to a defendant's blood-alcohol content based upon the application of the process of retrograde extrapolation has not been presented or preserved for review").

evidentiary support and contradicted by an abundance of evidence. First, the tests' downward trajectory is strong evidence that Cope was in the elimination phase; as Burbach explained, the second test likely would have reflected a higher BAC than the first test if Cope had consumed alcohol shortly before the tests were administered. In addition, Obodzinski testified that Cope had red eyes and a puffy face before the flight departed, and that Cope smelled of an alcoholic beverage during the flight.[3] Obodzinski sat in close proximity to Cope during the flight and did not notice him consume alcohol. There was a brief period after the flight landed during which Obodzinski lost sight of Cope. However, it defies reason and logic to believe that Cope quickly consumed a large quantity of alcohol in the morning hours while wearing a pilot's uniform in a public airport shortly before he was to serve as pilot on another flight, in blatant contravention of FAA regulations, his company's policy, and common sense. (*See* Tr. at 202.)

The Court concludes that Cope's BAC during the flight was well above .094 percent because his BAC was approximately .094 percent over three hours after his departure from Austin, and because he was in the elimination phase when the test was administered. From these conclusions, the Court readily reaches the determination that Cope was operating an aircraft while under the influence of alcohol. Cope protests that, regardless of his BAC, there is no record evidence indicating impairment. Indeed, Obodzinski testified that Cope appeared to sit straight, think clearly, and performed his

---

[3] Cope's alleged admissions to Obodzinski of consuming beer and other alcohol the night before the flight are further evidence that Cope was under the influence of alcohol during the flight and in the elimination phase when the tests were administered. However, because there is no contemporaneous documentation of Obodzinski sharing these admissions, the Court will not accord them any weight.

duties as Pilot Monitoring appropriately. As Burbach explained, however, an individual need not exhibit visible effects of alcohol consumption to be under its influence and significantly cognitively impaired. The Court is persuaded by Burbach's testimony regarding the effects of alcohol consumption on judgment and numerous other cognitive functions that at a BAC well above .094 percent Cope was under the influence of alcohol. Congress has mandated that an individual with a BAC of .10 percent or greater is presumptively under the influence of alcohol, 18 U.S.C. § 343, and it is highly probable that Cope's BAC was at least .10 percent when the flight departed. Even in the unlikely circumstance that Cope's BAC never rose above .094 percent, the Court still concludes that he was under the influence of alcohol while operating a common air carrier. In addition, Cope's own expert agreed that .04 percent BAC is a reasonable limitation on pilots in safety sensitive positions. (Tr. at 427-28.) It is extremely fortunate, particularly for the passengers on Flight 7687, that there exists no evidence of Cope making poor decisions affecting safety as the Pilot Monitoring. Nonetheless, the Court finds the evidence overwhelming that Cope was under the influence of alcohol during the flight.

## ORDER FOR CONVICTION

Based on the Court's Findings of Fact and Conclusions of Law, **IT IS HEREBY ORDERED** that:

1. Defendant Aaron Jason Cope is guilty of the offense charged in Count 1 of the Indictment.

-15-

2. The Court directs the United States Probation Office to prepare a presentence report. The presentence report will be due ten (10) weeks from date of this Oder.

3. The Court will contact the parties to establish a date for defendant's sentencing.

DATED: June 17, 2011
at Minneapolis, Minnesota.

                                                JOHN R. TUNHEIM
                                           United States District Judge